In the Matter of Edward Mike DAVIS d/b/a Tiger Oil Company, and Tiger Drilling Company, Inc., Debtors.

Rhett G. CAMPBELL, Trustee, Appellee Cross–Appellant,

v.

UNITED STATES of America, Appellant Cross–Appellee.

No. 88–2555.

United States Court of Appeals, Fifth Circuit.

Dec. 8, 1989.

Gary R. Allen, Chief, Linda E. Mosakowski, Henry K. Oncken, U.S. Atty., Joseph A. Pitzinger, III, William S. Rose, Jr., Asst. Atty. Gen., Wynette J. Hewett, Francis M. Allegra, Appellate Section, Tax Div., U.S. Dept. of Justice, Washington, D.C., for appellant cross-appellee.

John R. Knight, Rhett G. Campbell, Houston, Tex., for appellee cross-appellant.

Before GARZA, REAVLEY, and POLITZ, Circuit Judges.

GARZA, Circuit Judge:

On June 24, 1980, the debtors, Edward Mike Davis d/b/a Tiger Oil Company and Tiger Drilling Company, Inc., filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. These petitions were later consolidated. In a notice of deficiency mailed to Edward Mike Davis (Davis) on June 12, 1981, the Commissioner of Internal Revenue asserted deficiencies in income taxes and penalties against the debtors, as follows:

| Period Ending | Delinquency Penalty Section 6651(a) | Amount of Taxes |
|---|---|---|
| December 31, 1972 | $ 2,830 | $ 56,606 |
| December 31, 1976 | – 0 – | 871,488 |
| December 31, 1977 | 567,000 | 3,780,006 |

On August 18, 1981, the debtors brought an adversary proceeding in the Bankruptcy Court for the Southern District of Texas to resolve their liability for these taxes.[1] The adversary proceeding was eventually transferred to the Bankruptcy Court for the Western District of Texas in San Antonio (hereinafter the "San Antonio litigation").

On September 28, 1981, the Internal Revenue Service filed a proof of claim with the Bankruptcy Court for the Southern District of Texas seeking the payment of certain taxes, including those that were the subject of the San Antonio litigation. This claim against the debtors totaled $5,634,475.60.

On February 17, 1983, a second proof of claim was filed by the Internal Revenue Service asserting additional employment taxes in the amount of $39,155.21. The Government's September 28, 1981, claim was then supplemented on June 13, 1984, and again on December 18, 1984, adding claims for taxes, penalties and interest totalling $303,095.08. Between September 24, 1981, and June 18, 1984, the Internal Revenue Service also filed various claims for taxes incurred after the petition was filed, later filing amendments thereto, which together sought an additional $476,-718.59. The latter claim brought the total amount of taxes, penalties and interest being claimed by the Government to $6,453,-444.48.

On June 29, 1982, the San Antonio Bankruptcy Court entered Findings of Fact and Conclusions of Law, based upon which it held that the debtors were not liable for any of the taxes or penalties at issue in the San Antonio litigation, with the exception of approximately $84,000 that the debtors admitted was owed for the year 1972. Final judgment was entered on August 16,

---

1. The adversary proceeding was later expanded to consider a gift tax deficiency for the quarter ending September 30, 1986, in the amount of $1,231,620, including penalties and interest, which had been asserted in a notice of deficiency mailed by the Commissioner to Davis on July 9, 1982.

1982. On November 29, 1982, the IRS appealed this judgment to the District Court for the Western District of Texas in San Antonio. On May 27, 1983, while the appeal was pending, the debtors filed a First Amended and Consolidated Plan of Reorganization. This plan proposed the creation of a Creditor's Trust for the purpose of receiving certain cash and property from the bankruptcy estates and disbursing the proceeds realized from those assets and such other assets as may be received by the trustee to certain creditors, including the Internal Revenue Service.

On June 24, 1983, with the District Court in San Antonio still having not yet ruled on the appeal of the San Antonio litigation, the Bankruptcy Court for the Southern District of Texas entered an order confirming the amended plan. With respect to the San Antonio litigation, this order provided:

> The Trustee shall not make any distributions to Class 4 creditors until the tax litigation has been finally resolved or until a court order has been entered permitting such distribution. This Bankruptcy Court shall retain jurisdiction to determine whether the claim, if any, of the Internal Revenue Service may be subordinated to money borrowed by the trustee for the purposes of protecting, maintaining, preserving or developing the Trust Property.

The plan defined "tax litigation" to include the taxes involved in the San Antonio litigation, and any appeal, remand, retrial or other continuation of such litigation.

In 1984, with the District Court appeal in the San Antonio litigation still unresolved, the successor trustee of the Creditor's Trust, Rhett G. Campbell, filed an action in the Bankruptcy Court for the Southern District of Texas seeking, *inter alia*, to recover the balance of certain refunds that the debtors had claimed.[2] Although at that point the trustee sought only the amount of the refunds less a setoff for federal tax liabilities that were admitted to be due later, the trustee also asserted that under 11 U.S.C. § 502(d), all the Governments tax claims should be disallowed because of the IRS's failure to surrender the refunds after entry of the Bankruptcy Court's judgment in the San Antonio litigation, notwithstanding that the latter judgment was on appeal. The turnover action, nonetheless, was repeatedly continued by various judges of the Bankruptcy Court for the Southern District of Texas pending resolution of the appeal in the San Antonio litigation.

The district court appeal in the San Antonio litigation remained unresolved until Judge Edward C. Prado of the San Antonio District Court, on November 9, 1987, entered an order affirming the San Antonio Bankruptcy Court's judgment. Following the entry of judgment by the district court in the San Antonio litigation, the United States, on January 4, 1988, filed a notice of appeal to this Court. On March 10, 1988, however, the Government stipulated to a dismissal of its appeal. Shortly thereafter, representatives of the Internal Revenue Service met with the trustee and attempted to come to an agreement regarding the amount of refunds to be turned over to the trustee. These negotiations, however, proved unsuccessful and on March 15, 1988, the District Court for the Southern District of Texas (Hon. Lynn N. Hughes) conducted a hearing on the matter.

After receiving evidence and hearing oral argument, the district court disallowed a substantial portion of the United States' remaining tax claims, an amount totalling approximately $1,092,216.19, based on the Internal Revenue Service failure to turn over the refunds upon the request of the trustee.[3] The district court awarded $1,397,568.00 in principal and also awarded the debtors $15,000 in attorneys' fees. The court made this additional award "in order

---

2. The amount of the refunds sought in this complaint, was $396,736.49 together with statutory interest. This balance, however, did not take into account the taxes involved in the San Antonio litigation. The complaint also sought a declaratory judgment that the Internal Revenue Service was not entitled to continue to retain the refunds, and a permanent injunction preventing the Service from continuing to fail to pay the aforementioned sums.

3. The amounts disallowed consisted of interest and penalties on the delinquent taxes.

to speedily terminate the litigation," even though the trustee had made no formal application for the fees and had not provided any documentation regarding the legal costs incurred by him. On March 25, 1988, the district court entered an Amended Final Judgment incorporating its determinations.

From this judgment, the United States now appeals, and the trustee cross-appeals.

### Analysis

■ The touchstone of this appeal is the applicability of Section 502(d) to this fact pattern. We find that Section 502(d) was not intended to have a punitive effect and consequently does not apply in this case. The bankruptcy arena requires a careful analysis and distinction between punishing a debtor for not paying and affording a weary creditor the right to setoff.

### I. Section 553(a)—Setoff

The right to setoff is found in Section 553(a) of the Bankruptcy Code, which provides that:

> [the Bankruptcy Code] does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under the title against a claim of such creditor against the debtor that arose before the commencement of the case....

This right of setoff found in the current Bankruptcy Code was also found in the Bankruptcy Act of 1898.[4] The policy of Section 553(a) is to prevent the "possible injustice in requiring a creditor to file its claim for satisfaction in the bankruptcy court, while at the same time compelling the same creditor to pay in full its debt to the bankruptcy estate." *In re Southern Indus. Banking Corp.*, 809 F.2d 329, 332

(6th Cir.1987). See also *In re G.S. Omni Corp.*, 835 F.2d 1317, 1318 (10th Cir.1987).[5] Given the expressed policy, the extent or application of this policy is not clearly defined. In this scenario, the IRS' right to setoff derives from Section 6402(a) of the Internal Revenue Code of 1986, which provides that generally a party is only entitled to a tax refund of the amount which exceeds any outstanding tax liabilities. *Kabbaby v. Richardson*, 520 F.2d 334 (5th Cir. 1975); *U.S. v. Rochelle*, 363 F.2d 225 (5th Cir.1966).

The issue at hand is whether the IRS must refund the amount owed or be able to wait until the final determination in the San Antonio litigation. The district court held that the United States had unduly delayed the turnover of the refunds and consequently disallowed the government's other tax claims in the subsequent litigation. The appeal in the San Antonio litigation was resolved on March 10, 1988, and the hearing held and issues determined on March 15, 1988, which gave the IRS a net of five days to turn over the money. The district court dismissed the additional claims by asserting that five days was more than a reasonable time and thus Section 502(d) applied. The district court erred in using Section 502(d) to have this punitive effect.

The legislative history and policy behind Section 502(d) illustrates that the section is intended to have the coercive effect of insuring compliance with judicial orders. In this case, there is no showing of the IRS' lack of compliance, only the exercising of their right to appeal and delay payment to insure their ability to exercise their right to setoff. The IRS asserts that it stood ready, willing, and able to comply with the district court's turnover order when the San Antonio litigation was finalized.

---

**4.** 11 U.S.C. § 108(a) (1971).

**5.** The historical antecedent of the doctrine of setoff dates back to the Roman Empire and is based on the common sense notion that "a man should not be compelled to pay one moment what he will be entitled to recover back the next." Lloyd, The Development of Setoff, 64 U.Pa.L.Rev. 541, 541 (1916). See *N.Y. County*

*Bank v. Massey*, 192 U.S. 138, 146, 24 S.Ct. 199, 201, 48 L.Ed. 380 (1904). The doctrine was incorporated into the English bankruptcy scheme in 1705 and became part of the American bankruptcy scheme with the passage of the Act of 1800. See *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1164 (2d Cir.1979); 3 *Collier on Bankruptcy*, para. 553.01 (1988 ed.).

Granted, Section 502(d) should be used when something more than a gentle influence is needed, but penalization for appealing liability when the debtor stood ready, willing, and able is not the proper application of Section 502(d). This section is designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate.[6] We find that the five days which had elapsed since the final determination of the San Antonio litigation until the district court's dismissal did not afford the IRS a reasonable time.

■ Section 502(d) is designed to assure an equality of distribution of the assets of the bankruptcy estate not create penalties for asserting a setoff right. Bankruptcy is the area most likely to require a right to postpone payment until final adjudication of liability, otherwise the right to setoff would be worthy of little more than the book in which it is found. *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

■ The merits of the appeal is a legal issue but not proper in this dispute. A penalization for a meritless appeal can be accomplished, but not by using Section 502(d). The creditor is still entitled to a reasonable time after the final determination until Section 502(d) is kicked into effect. Thus, a court may not order a turnover in one instant and in the same instant disallow a creditor's claim for failing to comply with that order. Courts applying Section 502(d) have done so by affording the creditor a reasonable period of time before dismissing claims.[7] The district court in this case erred in not affording the IRS a reasonable period of time after the resolution of the San Antonio litigation.

An equitable analysis of this scenario yields the same result of affording the IRS a reasonable time after the entry of the order. Equity certainly cannot be used to impose a penalty when Congress did not intend one. In this case the distinction between coercion and penalization is an important one.

## II. Attorneys fees

■ The District Court's award of attorneys fees must fail as a result of the interpretation of Section 502(d). The only legal basis for that award is Section 7430 of the Internal Revenue Code of 1986. Under Section 7430, the appellee would only be entitled to recovery if classified as the prevailing party, which has two components. First, the appellee must establish that the position of the United States in the civil proceeding was unreasonable; and second, the appellee must have either substantially prevailed with respect to the amount in controversy or substantially prevailed with respect to the most significant issue or set of issues presented.[8]

Due to the reversal of the applicability of Section 502(d), the trustee is no longer the "prevailing party," because the IRS was not unreasonable in asserting their right to setoff nor in asserting that a reasonable time was something more than five days. Further, the party who substantially prevailed is yet to be determined, given the reinstatement of the IRS' dismissed claims. Consequently, the award of attorneys fees entered by the district court must be reversed. See *Huckaby v. U.S. Dept. of Treasury,* 804 F.2d 297 (5th Cir.1986).

## *Conclusion*

■ We find the legislative history and purpose behind Section 502(d) to be assuring the bankruptcy estate that a creditor will not be allowed to assert a claim without first paying his own debts, but not to be ready to penalize a wary debtor before

**6.** *Keppel v. Tiffin Savings Bank,* 197 U.S. 356, 361, 25 S.Ct. 443, 444, 49 L.Ed. 790 (1905).

**7.** See, *e.g., In re W & T Enterprises, Inc.,* 84 B.R. 838, 840 (Bkrtcy.M.D.Fla.1988); *In re Air One, Inc.,* 80 B.R. 145, 148 (Bkrtcy.E.D.Mo.1987); *In the Matter of Mid–Atlantic Fund, Inc.,* 60 B.R. 604, 604 (Bkrtcy.S.D.N.Y.1986); *In re Bob Gris-*

*sett Golf Shoppes, Inc.,* 50 B.R. 598, 607 (Bkrtcy. E.D.Va.1985).

**8.** See generally, H.R.Rep. No. 97–404, 97th Cong. 1st Sess. at 10–16 (1981); Senate Committee on Finance, "Technical Explanation of Committee," 127 Cong.Rec. S15587, S15593–S15595 (daily ed. Dec. 16, 1981).

the expiration of a reasonable time after final determination of liability. As a result of the decision regarding the IRS' claims being reversed, the attorneys fees award, which is attached to the trustee being the prevailing party is also reversed. Accordingly, the District Court is REVERSED on both the applicability of Section 502(d) and the award of attorneys fees. This case is REMANDED to the district court to reinstate the dismissed claims of penalties and interest. After proper determination of final liability, the district court shall render a corresponding judgment, allowing the reinstated claims of penalties and interest to be offset against the liabilities already litigated, and attorneys fees if found appropriate.